Okay. Good morning, Your Honors. My name is Kirk Hewlett. I represent the appellant, Mr Sanchez Ritchie. This case arises from Sempra's having maliciously and falsely accused my client of criminal trespass back in 2006 and subsequently in 2009. And the fallout from those false accusations included my client having to go into hiding to protect himself. His family was physically removed from the property and accosted. His ranch was bulldozed immediately after Sempra. Counsel, what is your strongest authority or record citation supporting your contention that it was a malicious report? The fact that Sempra had in its possession at the time the criminal complaint was filed, it knew that Mr. Ritchie had been in possession of that property since at least 1972. And the reason they knew that was because Mr. Robles, who was an agent of Sempra, he was hired by Sempra to... He was their lawyer, right? That's Robles? Is that Molina Robles? Yes. And he was not a lawyer. He was not a lawyer? He was a real estate broker agent who had, as he testified, had worked for Sempra down in Mexico on many different projects, including other pipeline projects, where he had secured title... Was he a notario? I'm sorry, I don't know. Was he a notario, a notary? I don't know that. I don't think that's part of the record. I don't remember. Okay, so go on. I'm sorry. And in 2001, he called my client and asked him to appear in a meeting at Sanborn's Restaurant in Tijuana to inquire as to whether my client was interested in selling his interest in the property, the 600 acres that he possessed and acquired through the Agrarian Reform Act. And I think one of the things in this case that continues to be debated is the difference between possession and title. And in Mexico, the concept of despojo and possession is something nine tenths of the law. Possession is a right and one that cannot be interfered with regardless of the title situation. And so in 2001, my client presented to Mr. Robles documents that he believed proved his entitlement to possession. Mr. Robles, as the agent of Sempra, was charged with that knowledge. Thereafter, there was no further contact, according to testimony, with my client until such time as in the late, mid to 2006 period of time, his property that he had been... So, all right, but let's back up a minute. Sure. To have a militia prosecution claim, you have to have a claim that was a complaint made without probable cause. Correct. All right. So as I understand what the district court held on summary judgment, it was that there was a determination by the Mexican court that there was probable cause and in this initial proceeding, and that your client had an opportunity to have six days of hearings and present whatever he wanted to present to that court. So therefore, I gather, there couldn't be a militia... What's her holding was that there couldn't be a militia prosecution claim. That was her holding. What? That was her holding. Right. Unless she could show fraud or misrepresentation. Right. Exactly. And so that was the focus of the hearing and the focus of our evidence was... Which hearing? I'm sorry. This was decided on summary judgment, no? It was. So what hearing are we talking about? The hearing in response to their motion. You mean just the argument? The argument, yes. Okay. The argument and the papers. And in fact, the evidence presented to your honors on the appeal focused not on the hearing of the probable cause hearing. All right. But I understood that, I understand that there was this dead person, but the finding, I understand, was that they didn't know that the person was dead in 2007. No, that's not what the court found. There was no, there was no evidence presented in 2006 to the court, to my knowledge. You've got to make it clear which court you're talking about. To the court of Mexico, the criminal court of Mexico in the January of 2007. My understanding is that you're not contesting that the probable cause finding was made, but that you think it was made as a result of fraud or perjury. It was wrongfully secured. Correct. What's the strongest argument that it was the result of fraud or perjury? Let me, as you do that, what are the material tribal issues of fact that remain? Did SEMPRA withhold material information to the, from the prosecutors when it was charging my client with trespass? Did they have facts in their possession at the time that would have led the conclusion? And one thing we have, I think... What's the competing evidence though in the record that shows that there's a factual dispute over what they knew? They deny the knowledge, and we have evidence that they did have the knowledge. And the knowledge that this woman died, or the knowledge that what? A couple of different things. A, that they had evidence in their body of knowledge that my client had presented them with evidence that they had no evidence of his possession of that property in any way, shape, or form. That's inconsistent with the facts that it's been testified to. Secondly, we have offered evidence through an expert testimony that in the course of performing due diligence on a... Let's back up a minute. As to that, my understanding is that your client did present evidence to the Mexican court of this 2001 meeting. Yes, that's true. Okay. So what was then, what was, what was the fraud? I mean, it was... The denial. Presented that they, they did have this knowledge. The, the denial, the denial of the, of the, of the meeting. Mr. Robles denied the existence of that meeting. Okay, but if the court knew about it at the time the probable cause finding was made, and, and it did. Yes. Is that right? So, so what, what, what's missing? What's... Your allegation is that the probable cause finding was secured by fraud, but it sounds like the Mexican court knew about the 2001 meeting. That's what I'm struggling with. To that, to that extent, that's true. The court did, was presented with information that SEMPRA had information about my client's legal possession. So what was withheld from the Mexican court when it made the the, the other issue, which was, we believe that the evidence shows that they had, through their due diligence investigation, reason to believe that Ms. Castagnon had passed away in 2004, and that becomes a nullity from the transaction. You cannot transfer property through a power of attorney when the grantor... Now, what's the basis for that, for that evidence, for that statement? It's from our, it's from our expert's report. So he says, your expert says, well, if somebody's in a transaction of this nature, they would conduct a more diligent search? That in the course of performing a due diligence, and in fact... Well, yes, but in order to have fraud, you have to have not just negligence, i.e. not doing due diligence, but actual fraud, i.e. they have to have known it. The only evidence that they knew it was that they should have known it, essentially? That in the course of due diligence, and here's one of the... Well, in the course of due diligence, an ordinary person would have found this out, but that's not evidence that they did find it out. It's only an evidence that they might have been negligent. Well, I'm not sure that it's only evidence that they would be negligent. If, during the course of their due diligence, they found out that fact... If they did, but what's the evidence that they did? From the expert testimony... But the expert testimony is just that they should have, but what's the evidence that they did? Well, I think that that evidence is not rebutted, that in the course of the due diligence process, what SEMPR has attempted to do here is that they've refused to produce their due diligence files in the course of this litigation, claiming that they were attorney-client privileged documents. We asked for them, we sought motions to compel them to get those documents to show what was, in fact, in those due diligence files. Well, you're not challenging that ruling on appeal. No, what we are challenging is the evidence that SEMPR now presents in response to the appeal that they did not find this out through the due diligence process. They're using the attorney-client privilege assertion as a sword and a shield. They refuse to give the documents up as to what, in fact, the due diligence files did reveal, but submitting declarations from witnesses claiming they didn't find this out during the due diligence investigation. So that was not adequately discovered, and we would suggest that the only evidence on this record that's admissible evidence is from the expert saying that in the ordinary course, these public records would have been discovered. But they should have known, in the ordinary course, they would have known that's your position, and they did not disclose to the Mexican court prior to this. Well, wasn't there also a separate section, Fraccion B, that didn't come from Castanon? Yes. So, therefore, wasn't there still probable cause, even if we assume the Castanon thing? No, there wasn't, because the property was adjacent to one another. He was on both properties. And, therefore, he was, there was at least one piece of this, one part of this property, which he was trying to access and which, as to which the person who conveyed it wasn't dead. Correct. Therefore, even if all of this other stuff had come out, it wouldn't have affected the probable cause in Mexico. Except to the extent that they knew that he was legally in possession of this property, he was entitled to possess this property since 1975. Well, I understand that. But you're focusing on the fact that there was a conveyance, or separate conveyances, of the two pieces, and that SEMPRA must have, because one of the people conveying the property was dead, they must have known that it wasn't a legitimate conveyance. But the other person who conveyed it wasn't dead. The question is, at the time that they filed the complaint for criminal trespassing. Did they believe that the people who was conveying property to them owned the property? Correct. And as to one of those people who was conveying property to them, what is the evidence that they didn't believe it? I don't have any. Forget Castanon. Other than, other than having gone to the meeting in 2001, that they were told that Mr. Sanchez Ritchie possessed the property, both A and B, that would be the best evidence. But I also, there's another compelling piece of evidence that. Because you identified two pieces. Yes. What's the third? The third piece of evidence is the, in 2001, Ms. Castanon and Mr. Pena were transferring, allegedly transferring the property in 2006. Understanding that my client had possessory interest because of the Agrarian Reform Act, went to courts in Mexico, to the Agrarian Department, and sought an interest in the property was superior to Mr. Ritchie's property. That document is dated 2001. Now, we presented to the district court evidence that that document from the Agrarian Reform Department that showed that Castanon and Pena were not granted title and were ordered that their property interests were not superior to my client. Those documents were found in SEMPRA's business files. In 2014? Correct. When did they acquire them? Well, that's a question of fact for the jury to determine, Your Honor. I would respectfully submit the only evidence on this record was and is that those documents came from SEMPRA's files, that we know that they conducted a due diligence investigation according to their own testimony, that these are public records. They testified that they reviewed the Agrarian Reform Department files. These were in those files, and we know that this document appeared in their files when they produced them in 2014. What we don't know is when specifically that document came to existence. There's been no denial by SEMPRA. So you would say the district court should have drawn an inference that they knew about that document when they went to the prosecutor? Yes. I would say that the facts are undisputed that they had this document in their files. When the document materialized in their files was not determined through the discovery process, and SEMPRA has not denied it. Well, for purposes of summary judgment, though, your argument has to be that you can draw a reasonable inference that it was in their file. They knew about it, that document. They had possession of that document at the time they went to the prosecutor. And from having admitted to performing a due diligence investigation. And the other evidence is that they presented many documents from the court filings to the prosecutor's office during the lead up to the January 2007 filing. With the prosecutor, we had a unique opportunity to get the AG, the Attorney General from Baja, under oath and testify that had he been presented with this document, that the prosecutor had given them in furtherance of their prosecution evidence, that the prosecution would not have gone forward, that this document in and of itself would have prevented him from moving forward. Can I just back up for a minute? And we'll give you some time for rebuttal. The district court relied in part on the finding that SEMPRA was the wrong you sued somebody. SEMPRA was not the person, the entity that was involved in all this in Mexico. If that were correct, then the rest of this would be spinach, basically. It wouldn't matter. Right? I gather, so what do you think, what do we do with that? Well, as we tried to present both at the argument for the trial judge and in our appellate papers, this issue was not raised by SEMPRA in its motion for summary judgment. And the most telling thing to support that statement is the judge's own statement to SEMPRA when they approached the podium, said, Mr. Hewlett's right. You didn't raise this. I can't believe you didn't raise this issue in your motion. And proceeded, and of course then SEMPRA jumps to the podium and says, of course we did, which is not the case. I think fairly stated, the court, the district court drops into a footnote that, gosh, I gave Mr. Hewlett two days notice because of this tentative ruling that this was going to be an issue. And during those two days, surely all the evidence supporting the claim that SEMPRA controlled the entities down in Mexico would have been presented. And given that, I asked for a short continuance of the hearing in order that we could supplement the record and respond to this, what we believe to be a newly created argument. And again, I think consistent with what the court said, she agreed that this was a newly raised issue on her part. And the court just declined and frankly didn't address the issue of whether to grant an additional extension of time. We did present one piece of evidence that I thought was sufficient to get past the motion for summary judgment. And that was the answer that SEMPRA gave to us to our complaint. And in paragraph 8 of that answer, paragraph 8 of the complaint, was the charging allegations that SEMPRA controlled the entities and related projects down in Mexico. And in response to that allegation, SEMPRA did not deny that it controlled ECA and the entities down in Mexico. And, you know, FRCP 8B6 specifically addresses this issue. Failure to deny an allegation is deemed an admission. So for that reason alone, without any further evidence, we believe that we overcame the court's concern about the proper party having been named. But I would like to return briefly to what I think is the most critical... I'll give you just a point. One more minute for this and then you've got to sit down. Okay, I apologize. But I do want to get to what I think to be really the most important factor here in rebutting the presumption of probable cause. And that is the compelling testimony from Mr. Luna, who was the Attorney General, and Ms. Navarro, who was his assistant prosecutor. In the testimony that he delivered, he was first called into the Lieutenant Governor's office, and Representative SEMPRA was also there. And in that meeting, the prosecutor felt that he was so heavily pressured that he felt compelled, these are the words that he used, compelled to follow the Lieutenant Governor's order. And he testified that he believed it was an order to file charges against SEMPRA. I thought he also testified, or she testified, that in the end, they believed that there was a basis for the charges. Well, I think that most people would perhaps testify accordingly. But the question is whether there are any facts from which a jury could conclude that the investigation was, in fact, not independent, that it was coerced, that there was political pressure applied by SEMPRA and others to encourage the prosecutor to come to a conclusion and pursue a claim that he was ordered to pursue. Okay. Thank you. I'll give you a minute for rebuttal. Thank you. We'll hear from SEMPRA. Good morning, Your Honors. May it please the Court, Marshall Camp for Appellee SEMPRA Energy. I think with respect to the malicious prosecution claim, the district court correctly found after five years of litigation that there were no genuine issues of material effect as to any of the elements. But Your Honors, I believe, correctly focused on the second element, that there is a plaintiff or appellant has to prove in order to prevail that it was an action taken without probable cause. And so before I address the… Can I just ask you about, just so we can get it off the table, this piercing the corporate veil kind of issue. You didn't really defend it, and I assume that you don't really want to. Is that right? Well, I don't think so, Your Honor. Piercing the corporate veil is an interesting way to put it. So when appellant filed this case seven years ago… It's a reverse. I understand. But the point is that, in fact, they didn't have an opportunity. You didn't raise it. They didn't really have an opportunity to deal with it. We don't need to get to it. Is that right? But it is only, of course, one issue of the three elements. But the point I would just like to make is it is an issue inherently. When you sue… Counsel, counsel, the question. Your time is ticking. The question is, it was a new issue, right? I don't think it was a new issue. What's your strongest shot at that, counsel? Well, there's two points, quickly. One is, we moved for summary judgment on a malicious prosecution claim against SEMPRA Energy. If what appellant wants to do is say, look at these acts by ECHA, those should be attributed to SEMPRA. Do you have a record site where you raised this issue? The distinction between the two? In your brief. Yeah. I think we moved… I mean, as the district court pointed out, the heading of our entire brief was, there is no evidence against SEMPRA. Yes, but that really has nothing… But that wasn't the substance of anything you said. I can tell I am not persuading you on the point. Your time is ticking away. Let me move on. All right. The other point I would obviously make is, the court clearly put the defendant, appellant, I'm sorry, plaintiff, appellant on notice when she issued a… Three days, right? Two days before the hearing. Oh, it's only two days. I believe it was two days before the hearing. Is it your position that was adequate notice? Absolutely. Your Honor… How could it be? You have to submit document. You have to submit declarations and evidence and everything else. That's ridiculous. After five years of litigation, one assumes… That's a ridiculous argument. What's your next argument? Let's move on. I won't dwell on a ridiculous argument. Back to the probable cause element, which I really do think is the heart of the claim. I just wanted to quickly go through the undisputed facts that existed prior to the filing of that complaint. That ECA had purchased the property from the registered title holders. That they'd done so in a notarized purchase agreement with a notario, reciting the chain of title from the federal government all the way to the registered title holders from whom they bought it. That ECA paid $4.5 million for that property. And that after it was acquired… And they didn't know at that time that he had lived on the property? That he had a house on the property? There's absolutely no evidence. No knowledge that nobody went out there and saw the house on the property? No, Your Honor. In fact, the house is, again, it's in the record. I believe we have sites in our brief. The testimony was that nobody was even aware of the structure, which was not visible. Well, didn't they go and knock it down very shortly thereafter? Yeah, they learned of it, clearly, over the course of this occupation and the contacts. Well, no, but how long after this sale did they knock the house down? After the sale. It was shortly after the order of possession in favor of Semper. Right, right. But let me just quickly go through. There is no dispute. Appellant has never disputed that he deposited motorhome campers on the property after it was purchased, that he came armed with a gun, threatened the employees His position has been on it the whole time. He talks about this 2001 meeting where he says he was asked whether he wanted to sell it. What about that? Right. So let me turn to those, given my time is limited. Once the complaint was filed, that would be enough, right, if there was probable cause for the filing a complaint at that time. You don't necessarily have to have an interim order. It happens in this case. We have one. There was not just one, but actually multiple. But the one we focused on that appellant has never addressed, not in the court below, not in its appellate briefing, is the February 2007 evidentiary hearing that Your Honors were asking about, a six-day evidentiary hearing. I think Your Honors correctly noted that any of these claims, that I've lived there, that I had a house there, could have been presented and, in fact, were presented. That's the record. He presented all of this to the court. The court found, okay, you've got a sale by the registered title holders, and the court concluded, as we point out in the brief, that's not enough. You're essentially claiming an agrarian reform. But that wasn't the ultimate conclusion, right? The ultimate conclusion was that he would. For purposes of malicious prosecution. I understand that, but, I mean, we can't go overboard about what this court held, because ultimately the Mexican courts decided it was right. Well, I think that's disputed, but certainly we're here because he's made a claim and has adduced evidence of a favorable termination. That's the basis of malicious prosecution. But the point is, it's a disfavored tort for a reason. All right, but let's go back to what Judge Christian asked about this 2001 meeting. Right. He did have an opportunity to produce evidence about it, but he says, and I guess this is what I wanted to find out about, that ECA's position was, essentially, that it didn't happen or they didn't know anything about this. Yeah. As with a number of things, I'm not sure what the record site is for that. I don't know that ECA represented that they didn't know what he was talking about. Certainly the meeting, I believe, is disputed. But whether or not there was a meeting in 2001 with a land expert who was working with SEMPRA is irrelevant. If the facts of that meeting were presented to the court and the court... Were they? Well, he presented the facts of the meeting, but if SEMPRA, let's just suppose if SEMPRA had said or ECA had said, he's lying, there was no such meeting, and the court chose to believe ECA, then would that be fraud if they were lying and they knew it wasn't true? Well, ECA's knowledge, I don't think it's the issue there. The issue is who has the right of possession. No, counsel, I don't understand this at all. I don't understand your position that this was irrelevant. It seems really relevant to me. I'm sorry, what wasn't relevant? If he takes the position that in 2001 he was offered money to sell his interest. Well, I don't think it's positions that he was offered money. Well, that's his argument, that he wanted to ask whether he would meet and whether he would like to sell. I think he alleges that he represented, he had an interest in potentially selling and purportedly represented to Mr. Robles that he did. There isn't any evidence that that's in fact what occurred. Well, his evidence... We're not talking about what in fact occurred. We're talking about what was represented to the court at the probable cause hearing. Right, and I believe he and I agree that when our, I believe there are evidentiary sites in the brief, he presented to the court this evidence. Yes, and so Judge Berzon's point, right there, Judge Berzon's point is, was it your client's position then that that evidence never, I'm sorry, that that meeting never took place, that the plaintiff, you know, sort of made it up? Because if so, it seems to me there's a real question about whether that's fraudulent. That's what Judge Berzon asked you. Yeah, I bluntly don't know the answer to whether ECHO, which is of course the subsidiary, presented at that hearing evidence regarding whether the meeting occurred. Okay. But my understanding of the proceeding that's reflected in the record is that what was being presented was evidence of possession, lawful or not. Not whether or not ECHO had at some point been told about the claim, but whether or not the appellant in fact had a legitimate claim to possession of the property. The court reviewed that evidence and concluded what you've given me, these statements, and we summarized the 197-page order, they don't add up to lawful possession. Now, Judge Berzon's of course right. Eventually, he gets a different ruling later in the case. But for purposes of malicious prosecution, where you're asking if somebody brought something without probable cause, the existence of an interim order that heard those facts and made the same determination would be determinative. Which is why we're asking whether the court heard the facts. Which I believe it did. There was a fellow at the meeting, alleged meeting in 2001, named Ruvalcaba. Right. A neighbor. And he testifies in his deposition that he was told by Robles to lie. Is that right? I believe that is his testimony. Was that presented to the court in 2007? I don't know if Ruvalcaba told the court... He certainly... There was evidence from Ruvalcaba presented in 2007. I don't know off the top of my head if he said ECHO told me not to tell the truth. But again, the point is, the facts were known to the court. To the extent... Facts of ownership, facts of possession. What he is saying that ECHO failed to disclose was disclosed. So whether or not ECHO itself provided this information to the court and, in fact, possessed it at any time, which is disputed, it got to the court. And so the question would then be, what's the ultimate probable cause? Mouth a little back. What got to the court was his position that in 2001 he had some possessory interest? Is that what got to the court? Sure. Not just 2001. It's his entire representation that I have effectively, adversely possessed. So what you're essentially saying is this 2001 meeting might be relevant to what Sempra knew, but it isn't relevant to whether he had a possessory interest. That's right. Yes, absolutely, Your Honor. Because whether or not he told Sempra or ECHO about these facts... That he had a possessory interest. Right. He either did or he didn't. Right. And that was made known to the court that issued the interim order. Beyond that, and I want to quickly address I think Your Honor or Judge Brezon noted with respect to the allegation about Ms. Castagnon, the witnesses testified that they didn't learn of her death, this includes 30b-6 witnesses, other witnesses, until at least 2008, well after the sale, well after the interim hearing. He says, well, they should have. That's obviously not the standard for malicious prosecution, which is fraudulent activity. The other point Judge Brezon raised is that Ms. Castagnon only owned half the or a fraction of the property. The other one is undisputed, sold by the registered owners. There's no dispute they were alive and actually executed the agreement. I suppose if Sempra knew that she was dead and purported to buy it from her, then you might impugn their motives and knowledge altogether and say that they also knew this other guy didn't know anything either. You could certainly impugn, I would say, quite a bit and there is no evidence of that. Why wouldn't it be a reasonable inference based on this expert's report that given a transaction of this nature, this amount of money, that a reasonable due diligence investigation would have uncovered her death? Yeah. Why isn't that a reasonable inference? Well, it's certainly a disputed one. No, but that's what the fact finder does. So I just wonder why it's not reasonable. Not the fact, but whether or not it would be a reasonable inference is disputed. I mean, we, of course, submit an expert who says in substance. You just have competing experts and it's for a fact finder to resolve that factual dispute. Right. I mean, it seems to me, it strikes me as reasonable that given in Mexico, given the size of this transaction, it's quite substantial that he would do a very thorough, careful due diligence, which you would think that would get you back to the alleged title holder or owner of the property. Well, that's the point, Your Honor. There is a record here that the title owner registered in the public records is the person Semper bought it from. And while we're talking about reasonable inferences, the entire frame of the case is a very unreasonable inference that Semper, buying a number of properties in this area, is approached by someone who says, I rightfully own this one. I'm interested in selling. And inexplicably says, no, thank you. We're going to go buy it from someone we believe doesn't have lawful title. We're going to spend $4.5 million and just invite, presumably, a lot of litigation. That is not a reasonable inference. The reasonable inference is that in buying the property from the registered title holder, Semper thought it was buying from the right person. There's no evidence in this record. This is not the person who holds onto their house as the developer builds the skyscraper and resists and there's some sort of ploy to sell it out from under them. This is a person who alleges he tried to sell it to Semper. Can we talk briefly about the other causes of action? Yes, Your Honor. Is there anything you want to tell us about it before I ask? Well, briefly. In particular, I don't see what the conversion cause of action as to personal property has to do with either any local action notion or any litigation notion. Well, let me take them in. So, first of all, let me just quickly say as my time's running out, there are, of course, multiple grounds we believe on which the court could affirm the dismissal. It's not just litigation privilege and local action but also active state and nor Pennington. But the district court didn't reach either of those. They're rather complicated. It doesn't sound like an active state. What was the other one? Nor Pennington. Nor Pennington. You're not asking us to reach that in the first instance. Well, we did in the brief. We believe it's an appropriate basis to affirm. I mean, the court didn't reach them but they were raised below where they were raised again. So you are asking us to reach that in the first instance? I just was looking for a yes or a no. Oh, yes. I'm sorry, Your Honor. An active state we feel is active. But I don't understand really as to, I mean, the things that are being complained about directly are not First Amendment type things. They're not even the litigation itself. There are actions taken, you know, perhaps on reliance of it, i.e. taking the property and knocking it over and taking, and so on. I don't see how that could possibly be a Nor Pennington problem. It's not about speech. Well, sorry. And I also am somewhat dubious that it's about, that it's maybe done on reliance on the litigation but it's not the litigation. Your Honor, I think it's very clear at least under the litigation privilege in California law that enforcement efforts pursuant to lawful orders that are privileged litigation contact, conduct are privileged. That's Rasheen, that's the Dahl v. Ghaffari case. Right. But at some point when you start using self-help and not, and are not invoking the order as such, doesn't it end? I mean, isn't there a cutoff point? Yeah, but I think that's the California Court of Appeal and Dahl v. Ghaffari dealt with a very similar set of circumstances. Enforcing an order, taking actions pursuant to a court order of procession is not self-help. Those are enforcement efforts. So, although there were allegations in the complaint of physical assault and so forth, thereby, allegedly, against people who aren't plaintiffs, the daughter and her family, they aren't the basis of any claim and he's not seeking any damages. They're just in there. What is the basis of the claim is the removal of appellant and the taking of possession of the property pursuant to an order of possession. That's the res geste of the case, that it was procured by fraud and that's why we're here. And so, in the litigation privilege context and that's in Dahl v. Ghaffari you had a landlord who took a possession, evicted the tenant, sold the possessions and released and the court said those are enforcement efforts pursuant to a lawful order and it didn't end until they observed that it wouldn't end until the tenant had an order of possession in their favor. That's what happened here. It begins with an order of possession in favor of ECHA and it ends in 2010 with an order of possession in favor of appellant. The actions in between pursuant to that order, which includes taking actions on one's property like bulldozing a structure that's left behind, just like the landlord in Dahl selling the belongings we think are within the litigation privilege. Before you sit down, just going back to malicious prosecution, what's your response to the testimony of the Attorney General and his assistant? Well, the response is, A, it's only relevant to a point the District Court didn't even reach, which is independent judgment, although we raised it the independent judgment rule. But the testimony taken, they're essentially statements, they're one-sided and that determination was that this evidence the appellant had presented to them of his purported ownership didn't hold up, it wasn't enough to support his claim, and therefore his entry was a trespass. Same conclusion the Court then reached. And so to the extent it were even to file a criminal complaint on the undisputed facts falls below the very lenient standard under California law, which is that no attorney would have thought that this had any merit, this criminal complaint. Thank you. Thank you, counsel. Short rebuttal? Thank you for allowing me to rebut. I'd like to just focus on the dismissal of the seven causes of action briefly. I'm sorry, I didn't hear that. That I want to focus on the issue of the dismissal, the 12B dismissal of the seven causes of action. Okay. So we talked about the local action rule and its transitory nature of the causes of action unrelated to the trespass. I think the court should focus its attention if necessary on the Biggio and the Kingsborough cases and talk expressly about conversion not being a local action issue. All right. So that might be one of the many causes of action from the local action rule. But what about the litigation privilege? The rule 47 or CCP 47 it only protects communications. I would ask the court  look at the  actions like Chacon    Rental housing is a good example. Rental housing is a good example. But the other actions like Chacon and Chacon Rental Housing is a         the other actions like Chacon Rental Housing is a good example. I would ask the court look at the actions  Chacon Rental Housing is a good example. I would ask the court look at the other actions like
judges: Paez, Berzon, Christen